**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 1:22-cr-361-DLF** |
| **v.** | : | |
| | : | |
| **CHASE ALLEN** | : | |
| | : | |
| **Defendant** | : | |

<u>**GOVERNMENT'S SENTENCING MEMORANDUM**</u>

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Defendant Chase Allen to 14 days incarceration, as part of a 36-month term of probation, 60 hours of community service, and $500 in restitution. Allen was part of a violent mob that assaulted members of the news media and destroyed property associated with the news media at the east front of the Capitol on January 6, 2021.

**I.      Introduction**

Defendant Chase Allen participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.

Allen pleaded guilty to one count of violating 40 U.S.C. § 5104(e)(2)(F).  A short sentence of incarceration as part of a term of probation is appropriate in this case because the

1

defendant participated in the assault on the media staging area and incited violent acts of destruction.

The Court must also consider that Allen's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and disrupt the proceedings. Here, the facts of and circumstances of Allen's crime support a sentence of 14 days incarceration as part of a sentence of 36 months' probation.

## II.     Factual and Procedural Background

### The January 6, 2021 Attack on the Capitol

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 21 (Statement of Offense), at 1-7.

### Defendant Allen's Role in the January 6, 2021 Attack on the Capitol

Allen traveled to Washington, D.C., from his residence in Massachusetts prior to January 6, 2021. On January 6, in the afternoon, Allen went to the Capitol grounds.

At approximately 4:50 p.m., a large crowd made its way to and/or past a media staging area that was set up outside the northeast corner of the U.S. Capitol, on U.S. Capitol grounds.  As individuals moved past metal barricades that had been set up around the staging area, media members were forced to flee the area before recovering all their cameras and associated equipment.   Numerous members of the crowd began to destroy the equipment, including cameras, tripods, lights, shades, and remote broadcasting equipment that belonged to various media outlets.   Numerous members of the crowd yelled inflammatory rhetoric against the members of the media.  One member of the media who was forced to flee the scene estimated that the equipment from his particular news organization that was destroyed was valued at

between $30,000 and $34,000.  Image 1 below depicts the staging area after the members of the news media had been forced to flee.



**Image 1**

Screen shot from open-source, showing rioters destroying media equipment at the media staging area on Capitol grounds. *Allen is not visible in this screen shot.*

At approximately 5:00 p.m., Allen approached the media staging area outside the northeast corner of the Capitol. There, Allen participated in destroying the media equipment and causing members of the news media to vacate the staging area and abandon their equipment. Allen yelled at media members to leave the area in an apparent attempt to disrupt the media from continuing with live broadcasts of events at the U.S. Capitol that day and to express his general disdain for the media. An open-source video recording captured Allen stomping on a Pelican$^{TM}$ case in the media staging area, as shown in Exhibit 1 in the opening 10 seconds. A screen shot from another open source video is shown in Image 2.



**Image 2**
Screen shot from an open-source video showing Allan (indicated by orange arrow)
stomping on media equipment

A nearby rioter cheered Allen on by stating, "Yeah, smash that shit," as heard on another

open-source YouTube video; a screen shot from this video is seen below in Image 3.



**Image 3**
A screen shot from an open-source video
(https://www.youtube.com/watch?v=_Tg_SJh9b_A), at timestamp 1:50 showing Allen stomping
on media equipment

Allen yelled at members of the news media, "Get the fuck out of here, get the fuck out of
here," as captured on another publicly available video. Approximately 15 seconds earlier in the
video, a member of the news media could be heard repeatedly saying, "We are leaving."



**Image 4**
Screen Shot from an open source video from Exhibit 2 (at :50 second timestamp)

Later, Allen dragged a camera and tripod before dropping it to the ground. Allen then stomped on the tripod and camera, as seen in Image 5.



**Image 5**
A screen shot from www.youtube.com/watch?v=bRwq6F9igyw, at time mark 0:49-0:54
minutes, showing Allen dragging the camera and tripod

*Allen's YouTube video*

Allen later posted a video on YouTube to his channel called, "The Allen Report,"
showing himself standing at the entrance of the Capitol Building. Allen stated, "I tried to get in
there, but they kicked everyone out last second, but it is what it is."

*Allen's FBI Interview*

On May 20, 2021, law enforcement officers interviewed Allen at his (then) residence in
Reno, Nevada. Allen stated that he considers himself to be a documentary filmmaker and travels
throughout the United States to film various events and then posts the videos to his YouTube
page. Allen confirmed that he was at the U.S. Capitol on January 6, 2021 filming the events.

When asked to explain his involvement with the Capitol riots on January 6, 2021, Allen
told law enforcement officers that he drove to Washington, D.C. from his home in Massachusetts

on January 5, 2021. Allen heard the planned protests were going to be "big." He met up with another documentary group, led by an individual who hosts a radio show in Wisconsin. Allen traveled with two associates. Allen and these other individuals stayed in a hotel in Washington D.C. on the night of January 5, 2021. While eating lunch on January 6, they saw on the news that the U.S. Capitol was being stormed by rioters. According to Allen, they quickly finished eating and then rushed to the U.S. Capitol to document what was happening.

According to Allen, upon arriving at the U.S. Capitol, Allen had a hard time walking around because the area was so packed with people. As Allen began trying to work his way up the steps of the Capitol, one of Allen's associates left, and his other two associates became separated. Allen stated that, after making it to the U.S. Capitol steps, he never entered the Capitol because he was skeptical of the law enforcement officers who were just letting people walk in and out. Allen stated that he knows it is not normal to be able to walk into the Capitol, even during tours, so he was afraid that it might have been a trap that could result in his arrest. Allen stated that he was on the side of the Capitol where a lot of scaffolding was in place. The "right" side of the building appeared to be cut off by law enforcement when he arrived. Allen eventually heard a commotion and moved toward it. He found a group of people in what appeared to be an area for media use. People were gathered around a pile of damaged media equipment to include cameras.

According to Allen, several people were stomping on the equipment in the media area. According to Allen, the group that was destroying equipment began piling the equipment up, sprayed it with Axe body spray, and unsuccessfully tried to set fire to the equipment. Allen denied participating in the destruction of equipment and said that he tried to de-escalate what was happening. Allen stated that he sometimes does things while filming among groups like

those at the U.S. Capitol to fit in and cause those around him to believe that he is one of them and not an opposing party. Allen stated that he will sometimes yell the same slogans or rhetoric as the crowd around him to give the appearance of being one of them. Allen told the FBI that he believes the worst thing he did at the Capitol riot was to use foul language

Allen further stated that he believes in the freedom of speech and intentionally avoids categorizing himself as a member of specific groups in order to gain access to extremist groups. Allen stated that he does his best to maintain his independence and does not pick sides. Allen told law enforcement officers that while he was in the media area outside of the Capitol, he "nonchalantly" tried to move stuff away from the pile of destroyed equipment. Allen stated that he pulled some cords and a tripod camera out of the area where people were trying to burn the equipment.

Allen stated that he posted the video he captured of the assault on the law enforcement officer to his YouTube channel, and believed he may have named it "Cop vs. the American People."

*The Charges and Plea Agreement*

On June 23, 2021, the United States charged Allen by criminal complaint with violating 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence on Grounds. On June 30, 2021, law enforcement officers arrested him at his residence. On November 22, 2022, the United States charged Allen by a one-count Information with violating 40 U.S.C. § 5104(e)(2)(F). On November 22, 2022, pursuant to a plea agreement, Allen pleaded guilty to Count One of the Information. By plea agreement, Allen agreed to pay $500 in restitution to the Architect of the Capitol.

### III.     Statutory Penalties

Allen now faces a sentencing on a single count of violating 40 U.S.C. § 5104(e)(2)(F). As noted by the plea agreement and the U.S. Probation Office, he faces up to six months of imprisonment and a fine of up to $5,000. Allen must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008). As this offense is a Class B Misdemeanor, the Sentencing Guidelines do not apply to it. 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

### IV.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. In this case, as described below, the Section 3553(a) factors weigh in favor of a sentence of 14 days' incarceration as part of a 36-month term of probation.

#### A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Allen's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors.

One of the most important factors in Allen's celebration of violence against members of the media during the riot.  Allen repeatedly stomped on media equipment, including a Pelican$^{TM}$ case and tripod and camera. He yelled at media members to leave the area in an apparent attempt

to disrupt the media from continuing with live broadcasts of events at the U.S. Capitol that day. Allen describes himself as a "documentary filmmaker, but violently destroyed equipment used by media companies. In doing so, Allen was attacking the free press, and the means by which citizens are kept informed about their government and current events.

Accordingly, the nature and the circumstances of this offense establish the need for a sentence of 14 days' incarceration as part of a 36-month term of probation in this matter.

### B. The History and Characteristics of Allen

Allen is a 26-year-old office manager, who was self-employed at the time of the offense and currently works as a manager of a store. PSR ¶¶ 44, 45.

Allen has one prior conviction, as a result of his arrest for trespassing in Las Vegas, Nevada, five days after his participation in the January 6 riot. When interviewed by federal agents on May 20, 2021, Allen said that on January 7 [sic], 2021, he visited Las Vegas, to conduct a "1st Amendment Audit" of the FBI Las Vegas Headquarters with a group called "Auditing America Defense" led by "Enrique." Allen told the agents that he aspires to conduct "1st Amendment audits" of a law enforcement agency in every state. Allen said that he was told he would be trespassing if he did not step back to the sidewalk. Allen told the agents that he went to leave and crossed the road without using the crosswalk, and was arrested by a Las Vegas Metro Police Department Officer for "jaywalking." Allen pled guilty to trespass in March 2022, and the Las Vegas Municipal Court sentenced Allen to 59 days in jail, suspended for one year. PSR ¶ 25. Allen's arrest for a trespass offense five days after his criminal conduct outside the Capitol on January 6 shows that even with several days to consider the gravity of his actions on January 6, Allen nonetheless traveled to another city, where he again engaged in criminal conduct.

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. Allen, did not enter the Capitol, but he did engage in destructive and violent activity towards persons on the grounds who were doing their job by keeping citizens and the world apprised of what was occurring on that date. As with the nature and circumstances of the offense, this factor supports a short sentence of incarceration.

### D.  The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2) (B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

 The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same

12

mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. At 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

During the presentence interview with the United States Probation Officer, Allen provided a statement expressing his "deep remorse" for his conduct on January 6, 2021. He stated that he "did not anticipate that the event would become violent," and stated that he was "ashamed that I was involved. I am ashamed of what I did for many reasons, but especially because I respect the dedicated work that journalists do." Allen apologized to the officers, the government officials and their staff, the media and "to everyone who was affected." PSR at ¶¶ 21, 22.

While Allen states in his written apology that he "did not anticipate that the event would become violent," he told the FBI in May 2021 that he and his associates went to the Capitol because they saw the news reports of it being stormed. The government's evidence places him at the Capitol at 5:00 p.m., after worldwide media had been livestreaming the violence for hours. Thus, far from not anticipating that the event would become violent, Allen went to the Capitol already knowing – and precisely because – the event had become violent. And most

significantly, once at the Capitol, Allen participated in the violence by stomping on media equipment and yelling at the media, who abandoned their equipment and fled. Thus, the government's evidence and Allen's own statement reveal that his statement of remorse is not premised on a factually accurate statement of his conduct. Nonetheless, the government has considered Allen's written expression of remorse in its sentencing recommendation.

In considering the need for specific deterrence, the government also notes that in May 2021, when interviewed by the FBI about his conduct on January 6, Allen falsely claimed that he did not participate in the destruction of equipment, that he tried to de-escalate what was happening, that he "nonchalantly" tried to move things away from the pile of destroyed equipment, and that he pulled some cords and a tripod camera out of the area where people were trying to burn the equipment. The government also notes Allen's continued criminal conduct five days after January 6. All of these factors suggest the need for specific deterrence, notwithstanding that, as noted above, Allen has now submitted a written expression of remorse to the United States Probation Office.

 A period of incarceration as part of a probation sentence is warranted in order to deter him from engaging in such activities in the future.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[1]

---

[1] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

This Court must sentence Allen based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct.

Allen has pleaded guilty to Count One of the Information, charging him with Act of Physical Violence on Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F). This offense is a Class B misdemeanor. 18 U.S.C. § 3559. Certain Class B and C misdemeanors and infractions are "petty offenses," 18 U.S.C. § 19, to which the Sentencing Guidelines do not apply, U.S.S.G. § 1B1.9. The sentencing factors set forth in 18 U.S.C. § 3553(a), including "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C.A. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Section 3553(a)(6) does not limit the sentencing court's broad discretion under 18 U.S.C. § 3553(a) "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." 18 U.S.C. § 3553(a). Although unwarranted disparities may "result when the court relies on things like alienage, race, and sex to differentiate sentence terms," a sentencing disparity between defendants whose differences arise from "legitimate considerations" such as a "difference[] in types of charges" is not unwarranted. *United States v. Bridgewater*, 950 F.3d 928, 936 (7th Cir. 2020).

"Congress's primary goal in enacting § 3553(a)(6) was to promote national uniformity in sentencing rather than uniformity among co-defendants in the same case." *United States v. Parker*, 462 F.3d 273, 277 (3d Cir. 2006). "[A] defendant cannot rely upon § 3553(a)(6) to seek a reduced sentence designed to lessen disparity between co-defendants' sentences."

Consequently, Section 3553(a)(6) neither prohibits nor requires a sentencing court "to consider sentencing disparity among codefendants." *Id.* Plainly, if Section 3553(a)(6) is not intended to establish sentencing uniformity among codefendants, it cannot require uniformity among all Capitol siege defendants charged with petty offenses, as they share fewer similarities in their offense conduct than codefendants do. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Tr. at 48-49 ("With regard to the need to avoid sentence disparity, I find that this is a factor, although I have found in the past and I find here that the crimes that occurred on January 6 are so unusual and unprecedented that it is very difficult to find a proper basis for disparity.") (statement of Judge Chutkan)

Cases involving convictions only for Class B misdemeanors (petty offenses) are not subject to the Sentencing Guidelines, so the Section 3553(a) factors take on greater prominence in those cases. Sentencing judges and parties have tended to rely on other Capitol siege petty offense cases as the closest "comparators" when assessing unwarranted disparity. But nothing in Section 3553(a)(6) requires a court to mechanically conform a sentence to those imposed in previous cases, even those involving similar criminal conduct and defendant's records. After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—

differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. It follows that a sentencing court in a Capitol siege petty offense case is not constrained by sentences previously imposed in other such cases. *See United States v. Stotts*, D.D.C. 21-cr-272 (TJK), Nov. 9, 2021 Sent. Hrg. Tr. at 33-34 ("I certainly have studied closely, to say the least, the sentencings that have been handed out by my colleagues. And as your attorney has pointed out, you know, maybe, perhaps not surprisingly, judges have taken different approaches to folks that are roughly in your shoes.") (statement of Judge Kelly).

Additionally, logic dictates that whether a sentence creates a disparity that is unwarranted is largely a function of the degree of the disparity. Differences in sentences measured in a few months are less likely to cause an unwarranted disparity than differences measured in years. For that reason, a permissible sentence imposed for a petty offense is unlikely to cause an unwarranted disparity given the narrow range of permissible sentences. The statutory range of for a petty offense is zero to six months. Given that narrow range, a sentence of six months, at the top of the statutory range, will not create an unwarranted disparity with a sentence of probation only, at the bottom. *See United States v. Servisto*, D.D.C. 21-cr-320 (ABJ), Dec. 15, 2021 Sent. Hrg. Tr. at 23-24 ("The government is trying to ensure that the sentences reflect where the defendant falls on the spectrum of individuals arrested in connection with this offense. And that's largely been accomplished already by offering a misdemeanor plea, which reduces your exposure substantially.") (statement of Judge Berman Jackson); *United States v. Dresch*, D.D.C. 21-cr-71 (ABJ), Aug. 4, 2021 Sent. Hrg. Tr. at 34 ("Ensuring that the sentence fairly reflects where this individual defendant falls on the spectrum of individuals arrested in connection with the offense has largely been accomplished by the offer of the misdemeanor plea

because it reduces his exposure substantially and appropriately.") (statement of Judge Berman Jackson); *United States v. Peterson*, D.D.C. 21-cr-309, Sent. Hrg. Tr. at 26 (statement of Judge Berman Jackson) (similar).

Although the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

There have been few other convictions for 40 U.S.C. § 5104(e)(2)(F) to date.[2] Nonetheless, this case is comparable to many other parading and demonstrating cases that have been sentenced in this Court, a few of which are highlighted below:

In *United States v. Katherine Stavely Schwab,* 21-cr-050 (CRC), the defendant anticipated and prepared for potential violence on January 6; she chose to join the crowd at the Capitol after learning that it was the site of an ongoing riot; when entering the Capitol, she could see broken windows and hear blaring alarms; after she exited from the Capitol building, she saw and recorded video on her phone of police officers struggling to disperse the crowd; she shouted epithets at the officers who were valiantly trying to protect the Capitol and its lawful occupants, calling them "traitors" and thereby possibly inflaming the crowd; she shouted for others to resist police efforts to disperse the crowd; outside the Capitol, she joined a Facebook livestream and announced that she "stood her ground"; as rioters violently destroyed press equipment in a media enclosure, she joined others in shouting insults intended to incite further violence; she then

---

[2] In several January 6 cases, defendants have been convicted of violations of 18 U.S.C. 5104(e)(2)(F) and other offenses, but have not yet been sentenced. The government is not aware of any January 6 defendant convicted solely of violating Section 5104(e)(2)(F) who has been sentenced.

joined the violence, throwing and kicking press equipment; and she later lied to the FBI. Upon Schwab's guilty plea to a violation of 18 U.S.C. § 1752(a)(2), the court sentenced Schwab to 45 days' incarceration. Like Schwab, Allen chose to join the crowd at the Capitol after learning that it was the site of an on-going riot; as rioters violently destroyed press equipment, Allen joined in the violence, kicking and stomping on equipment; and Allen later lied to the FBI. While Allen has pled guilty to a less serious offense than Schwab, a short sentence of incarceration is likewise appropriate here.

Similarly, in *United States v. Eric Barber,* 21-cr-228 (CRC), the defendant prepared for violence by wearing a Kevlar ballistic helmet to Washington, D.C.; heard the crowd yelling "Hang Mike Pence" and saw the gallows erected by the rioters but entered the Capitol nonetheless, via a broken window; witnessed violence against police as he wandered through the Capitol; stole a power station from a C-Span media station; participated in a media interview in which he lied about not entering the Capitol; and had a substantial criminal history, including a prior conviction for breaking and entering. Upon his conviction of violation 18 U.S.C. § 5104(e)(2)(G), the Court sentenced him to 45 days' incarceration. Once again, while Barber's conduct was more serious than Allen's conduct, a short sentence of incarceration is likewise appropriate in Allen's case.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision

involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.[3]

---

[3] Numerous judges of this Court have concluded that a sentencing court in a case involving a violation of a Class B misdemeanor under 40 U.S.C. § 5104 may impose a "split sentence" – a period of incarceration followed by a period of probation – for defendants convicted of federal petty offenses. See, e.g., 18 U.S.C. § 3561(a)(3); *see, e.g., United States v. Little*, 21-cr-315 (RCL), 2022 WL 768685, at *1 (D.D.C. Mar. 14, 2022) (concluding that "a split sentence is permissible under law and warranted by the circumstances of this case"); *see generally* Appellee's Brief for the United States, *United States v. Little*, No. 22-3018 (D.C.) (filed Aug. 29, 2022). Approximately nine judges of this district have authorized and imposed such split sentences pursuant to law. *But see United States v. Panayiotou*, No. 22-CR-55 (DLF), 2023 WL 417953 (D.D.C. Jan. 25, 2023) (holding that such sentences are impermissible under Section 3561(a)(3)).

In the alternative, courts have also issued sentences under 18 U.S.C. § 3563(b)(10), which authorizes limited periods of intermittent confinement as a condition of probation. The courts have consistently found that such a sentence is permissible for up to two weeks' imprisonment served in one continuous term. *See, e.g., United States v. Mize*, No. 97-40059, 1998 WL 160862, at *2 (D. Kan. Mar. 18, 1998) (quoting Section 3563(b)(10)'s legislative history in interpreting the term to mean a "brief period of confinement, e.g., for a week or two, during a work or school vacation," described above and reversing magistrate's sentence that included 30-day period of confinement as a period condition of probation). To this end, at least four of the judges of this Court have imposed sentences under §3563(b)(10). Indeed, a sentencing court may also impose multiple intervals of imprisonment under §3563(b)(1). *See United States v. Anderson*, 787 F. Supp. 537, 539 (D. Md. 1992); *Panayiotou*, 2023 WL 417953, at *9 ("in a case in which the government exercises its prosecutorial discretion to allow a defendant to enter a plea to a single petty misdemeanor, it can request that a court impose a sentence of intermittent confinement as a condition of probation.") (citing 18 U.S.C. § 3563(b)).

In this district, at least two judges have similarly imposed multiple terms of imprisonment, to be served intermittently, consistent with this subsection. Such sentences are particularly appealing in light of the fact that it has been nearly three years since the World Health Organization first declared the COVID-19 outbreak a global pandemic in March 2020, and over two years since the first COVID-19 vaccine was administered in the United States in December 2020, allowing detention facilities to now more safely handle the logistical and practical concerns associated with multiple stints of imprisonment.

V.      **Conclusion**

Sentencing requires the Court to carefully balance the § 3553(a) factors. Balancing these factors, the government recommends that this Court sentence Defendant to 14 days' incarceration, as part of a 36-month term of probation, 60 hours community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:     *Jennifer Leigh Blackwell*
        Jennifer Leigh Blackwell
        Assistant United States Attorney
        United States Attorney's Office
        For the District of Columbia
        D.C. Bar No. 481097
        Jennifer.blackwell3@usdoj.gov
        (202) 803-1590