# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

     *Plaintiff*

v.

CHASE ALLEN,

     *Defendant.*

                                        **Criminal No. 1:22-cr-00361-DLF**

## Chase Allen's Sentencing Memorandum

On January 5, 2021, Mr. Chase Allen, then a twenty-four-year-old young man from Massachusetts with no prior criminal history, traveled to Washington D.C with a plan to document the following day's planned January 6th protests for his amateur videographer social media accounts. His hope to capture video footage at the Capital for his aspirational video documentarian career devolved into grave errors of judgment when Mr. Allen joined an outside crowd of rioters gathered on the Capital grounds and engaged in behavior that included property damage of abandoned media equipment. Chase accepts full ownership and accountability for his behaviors on that day, he believes that it was unquestionably unacceptable, and he submits this memorandum to assist the Court in sentencing him to the offense that he has pled guilty to and takes responsibility for – a single misdemeanor count of an Act of Physical Violence on U.S. Capitol Grounds, in violation of 18 U.S.C. § 5104(e)(2)(F).

1

For the reasons set forth below, he asks this Court to accept his guilty plea and impose a sentence of three years of probation, as well as agreed-upon restitution[1] in the amount of $500. The requested sentence, which is jointly recommended by Federal Probation,[2] is consistent with the factors set forth in 18 U.S.C. § 3553(a) and will result in a sentence that is sufficient, but not greater than necessary, to effectuate the purposes of sentencing. *United States v. Kimbrough*, 128 S.Ct. 558 (2007); *United States v. Booker*, 125 S.Ct. 738 (2005); *United States v. Martin*, 520 F.3d 87 (1st Cir. 2008); *United States v. Rodriguez*, 527 F.3d 221 (1st Cir. 2008).

I.    ***Chase Allen's History and Characteristics and the Nature and Circumstances of the Offense***

Today, Mr. Allen is an earnest and polite twenty-six-year-old who has lived the majority of his life in the small town of Seekonk, Massachusetts. *PSR* at ¶¶31, 34. An only child raised by his mother, he grew up in a small close-knit family unit of two, and he reflects on his upbringing with appreciation and positivity, admiring the hard work of his mother in raising him alone as a single parent. PSR at ¶32. As a child, and throughout high school, Chase loved school and learning, but sometimes struggled, often frustrated by learning disabilities that he still navigates to this day.

---

[1] Restitution in the amount of $500.00 has been agreed upon by Mr. Allen and the government in the parties' plea agreement, docketed at entry 30. D.E. at 30.

[2] The sentencing recommendation of Federal Probation is filed on the docket at entry 37. *See* D.E. at 37.

. *See School Records of Chase Allen*, p. 2 attached as Exhibit A; *see PSR* at ¶¶ 38-39. Despite these challenges, Mr. Allen graduated from his local high school in Seekonk in 2014. *PSR* at ¶ 42. Having created and run a chapter of the United States Marine Corps Junior Officer Reserve Corps (JROTC) at his high school and participated in the Civil Air Patrol and the East Providence Police Explorer Program while still a student, Chase thought he might someday join the military or pursue a career in law enforcement. *See PSR* at ¶ 42.

However, in the years immediately following high school, Mr. Allen continued to live with his mother, with whom he remains very close, and contributed financially to their household as best he could, by working various jobs at a local grocery store chain and a nearby pizzeria. *See PSR* at ¶¶ 47-48. He was also an essential support for his mother, in her capacity as a foster parent – where, for the past nine years, she had taken intensive foster placements of children with

_____

significant developmental and emotional challenges into their home. *PSR* at ¶ 34.

As his mother describes:

> "Chase has always been an integral part of helping me care for the
> foster children who come to live with us in our home. He is incredibly
> supportive and patient with our children and can always engage and
> redirect them, even in moments when they are struggling and having a
> very difficult time."

*Support Letter of Alice Allen*, attached as Exhibit B.

In his spare time, Chase discovered a love of film and video, and began

creating his own documentary news and current events videos, as well as wildlife

video projects, which he then posted on social media. *PSR* at ¶ 46. He admired

investigative journalists and sometimes dreamed about one day going to journalism

or film school. In the years leading up to 2021, Mr. Allen also began taking trips

around the country, making video 'documentaries' of public events, protests, and

social justice events, including Black Lives Matter rallies and marches, the 'Capital

Hill Occupied Protest' in Seattle, Washington, local town rallies in Massachusetts

and Rhode Island, as well as political rallies and marches - which he would post on

social media, receiving supplemental income from subscribers and donations. *See*

*PSR* at ¶ 44, 46. As he set out to travel to Washington D.C. in anticipation of the

planned January 6, 2021 Trump rally and related protest – Mr. Allen's motivation

was the same – to make video documentary content of the events and then post

them on social media. Unfortunately, on the actual day in question, instead of

documenting from the sidelines, Mr. Allen made the incredibly misguided decision

to get swept into - and join in - the frenzy and behaviors of the crowd. Mr. Allen

acted in ways he is deeply ashamed of. His behavior in this case – which includes

joining a crowd outside on Capitol Grounds by the media staging area engaged in

destroying abandoned media equipment, participating in the fracas, and stomping

on a hardshell media Pelican case, *PSR* at ¶¶ 13-15, is behavior that he readily

takes responsibility for.

Mr. Allen acknowledges both the unacceptability and the illegality of his

behavior, as well as the greater overarching dangers and ills of what transpired at

the Capital on January 6, 2021. As he says in his own words:

> "I am deeply remorseful for my actions on January 6, 2021, I regret
> even going to Washington, D.C. for that trip that took me to the
> Capital on that day. I did not anticipate that the event would become
> violent, and I am ashamed that I was involved. I am ashamed of what I
> did for many reasons, but especially because I respect the dedicated
> work that journalists do."

*PSR* at ¶ 21.

Moreover, in these past two years, Mr. Allen has experienced some of the real

life repercussions that have resulted from his choices and actions on January 6.

Given Mr. Allen's federal criminal prosecution in this case, his mother has been

prohibited from taking intensive foster child placements into their shared home. As

his mother has expressed, her inability to take in foster placements:

> "[H]as been a real blow to me (both financially but also to my sense of
> purpose). Seeing the way his actions have directly negatively impacted
> me is something Chase cannot forgive himself for."

*Exhibit B*, p. 1. Additionally, this year, after meeting with an Army recruiter, Mr.

Allen learned that his current criminal prosecution was a bar to his long-held hope

of enlisting in the military. As his mother further observes:

"Actions have consequences. That is something Chase has come to learn, and live, in a deep way, over the past two years since this case began. Recently, he learned that his prosecution in this case is a bar to him joining the Army, a painful realization for him, as this was something he had hoped to do for a long time. As a mother you never want to see your child (whatever age they are) feel pain, but I think these realities have helped spur his motivation to do better and to be better - for himself, but just as importantly, for those around him."

*Id.*

The stark reality of his prosecution and conviction in this case, the related and on-going consequences of his behavior, and Mr. Allen's sincere regret and acceptance of responsibility for his behavior, have all been impactful, grounding, and sobering experiences. In the nearly two years that have passed since Mr. Allen's initial appearance on this case, he has worked hard to abide by all the terms of his pre-trial release without a single misstep. *PSR* at ¶ 21. He has further sought support with a local Massachusetts organization offering resources to individuals with disabilities, the Massachusetts Rehabilitation Commission,[5] and he has also found a full-time job at Ollie's Bargain Outlet in Seekonk, a local store in his community where he has worked for the past nine months. His supervisor at work describes him as a valuable and dependable employee, who "is great with customers", has an "open and supportive attitude", "is reliable....[with] a positive and friendly demeanor", and "is approachable and kind – making him a very important part of my team." *See Letter of Employer Erica Dellolacono*, attached as Exhibit C.

---

[5] Information on the Massachusetts Rehabilitation Commission, the resources they provide, and the individuals they serve, is available at https://www.mass.gov/orgs/massachusetts-rehabilitation-commission.

## II.     The Needs a Sentence Must Fulfill

As in all sentencing proceedings, the Court's determination comes down to deciding what punishment is fair, necessary, and appropriate, given all of the relevant facts and circumstances. The goal of federal sentencing is to fashion a sentence based upon an individual assessment and not wedded to a mathematical calculation. *Gall v. United State*s, 552 U.S. 38, 49 (2007); *Kimbrough v. United States*, 552 U.S. 58, 90 (2007)(observing that the Guidelines "now serve as one factor among several courts must consider in determining the appropriate sentence"). In other words, sentencing is more than "merely a means to dispense harsh punishment without taking account the real conduct and circumstances involved in sentencing, and the individual person that stands before the Court. *Id* at 54.

Unquestionably, "[i]mposing a sentence on a fellow human being is a formidable responsibility," compelling "a court to consider, with great care and sensitivity, a large complex of facts and factors." *United States v. Gupta,* 904 F. Supp. 2d 349, 350 (S.D.N.Y. 2012). The Court must conduct a "more holistic inquiry" than simply plugging numbers into a guidelines calculation, and "section 3553(a) is more than a laundry list of discrete sentencing factors; it is, rather, a tapestry of factors, through which runs the thread of an overarching principle." *United States v. Yonathan Rodriguez*, 527 F.3d 221, 228 (1st Cir. 2008) (citing *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007)). That overarching principle is to "impose a sentence sufficient but not greater than necessary." *Id*. In reaching a decision on what constitutes an appropriate sentence, the district court should

"consider all the relevant factors" and "construct a sentence that is *minimally*

*sufficient* to achieve the broad goals of sentencing." *Id.* (emphasis added).

In addition to consideration of other §3553(a) factors, such as the nature and

circumstances of the offense, and Mr. Allen's history and characteristics, addressed

above, the Court must fashion a sentence that satisfies the four needs a sentence

must fulfill. Put simply, those needs are: punishment, deterrence, incapacitation,

and rehabilitation. *See* 18 U.S.C. §3553(a)(2). For Mr. Allen, a sentence of 36

months of probation and restitution fulfills those needs.

The first purpose of sentencing is to "to reflect the seriousness of the offense,

to promote respect for the law, and to provide just punishment for the offense." 18

U.S.C. §3553(a)(2)(A). Certainly, this case is serious, and through his plea, Mr.

Allen acknowledges that his actions merit punishment, he recognizes the significant

harm and negative impact of his actions on January 6th, and he does not seek to

minimize the seriousness of his conduct or the harms it has caused. His crime,

although serious, was an inherently non-violent property offense that was the result

of unplanned, impulsive, flawed decision-making, and was not borne of a plan,

desire, or motivation to hurt others, disrupt democracy, or upend the proper

functioning of Congress or our government.

When considering what type of sentence is necessary in this case in order to

punish Mr. Allen for the crime he committed, this Court should consider the

consequences that will befall him now that he has pled guilty and been convicted of

the instant crime here. At 26 years old, Mr. Allen is now convicted of a federal

crime, a status that will likely have repercussions throughout his adult life. Prior to

the instant offense, Mr. Allen had never been convicted, let alone charged, with a

crime. Now, however, he has been convicted of federal offense, faces restitution, and

is confronting the possibility of a carceral sentence. This has proven to be a sharp

and impacting wake-up call. And as Mr. Allen has never previously been

incarcerated, served any committed time, or even been sentenced to federal

probation, he doesn't require a more severe sentence that might be necessary for

someone who has been unimpacted by prior sentences of that nature.

As such, Mr. Allen asks this Court to impose the recommended sentence,

which allows him to continue on his continued upward trajectory of growth and

stabilization in his community and allows him to begin repaying the ordered

restitution. Such a sentence, which maintains structure and support for him

through a demanding 36-month term of probation with carefully crafted conditions,

also, in itself, constitutes punishment. *See Gall v. United States*, 552 U.S. 38, 44

(2007) (describing probation as a "substantial restriction on freedom"). In addition,

the fact that Mr. Allen has been prosecuted for a felony offense in federal court, and

will live with that felony conviction forever, further serves to reflect the seriousness

of the offense and promote respect for the law.

Lastly, the proposed sentence promotes respect for the law pursuant to

§3553(a)(2)(A) because "[T]he unique facts of [Mr. Allen's] situation" support the

conclusion that "a sentence of [excessive] imprisonment may work to promote not

respect, but derision, of the law if the law is viewed as merely a means to dispense

harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall v. United States*, 552 U.S. 38, 54 (2007) (citations omitted).

As to deterrence, the recommended sentence would have an "adequate" deterrent effect on both the general public and Mr. Allen. Determining the sentence that would "adequate[ly]" deter criminal conduct is appropriate because over a decade's worth of research indicates that while certainty of being caught and punished produces a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "Three National Academy of Science panels . . . reached that conclusion, as has every major survey of the evidence." *Id.*; see also Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White-Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 447-48 (2007) ("[C]ertainty of punishment is empirically known to be a far better deterrent than its severity.").; Steven N. Durlauf & Daniel S. Nagin, *Imprisonment and Crime: Can Both be Reduced?*, 10 Criminology & Pub. Pol'y, 37 (2011)[6]; Raymond Pasternoster, *How Much Do We Really Know About Criminal Deterrence*, 100 J. Crim. L. & Criminology 765, 818 (2010); Daniel S. Nagin, *Deterrence in the Twenty-First Century*, 42 Crime & Just. 199, 201 (2013).

In sum, empirical studies have shown that longer sentences have minimal or no benefit on whether potential offenders commit crimes. The National Academy of

---

[6]     Available at http://onlinelibrary.wiley.com/doi/10.1111/j.1745-9133.2010.00680.x/pdf.

Sciences (NAS) concluded that there is insufficient evidence justifying policy choices

on the assumption that harsher punishments yield measurable deterrent effects,

and that all leading surveys of the deterrence research reach the same conclusion:

that 'potential offenders may not accurately perceive, and may vastly

underestimate, those risks and punishments' associated with committing a crime.[7]

Indeed, having never before been charged with a federal crime, it is in fact

likely that Mr. Allen's prosecution and conviction in this case will be deterrence

enough. For almost two years, Mr. Allen has shown that his prosecution in this case

has deterred him and that he has successfully abided by all court-ordered conditions

of release, indicating that there is no need to incarcerate him out of concerns for

public safety or to deter him from future criminal conduct. Data collected by the

Sentencing Commission, demonstrates that offenders with zero criminal history

points, like Mr. Allen,[8] have a lower recidivism rate than offenders with even one

criminal history point. Tracey Kyckelhahn & Trishia Cooper, U.S. Sentencing

Comm'n, *The Past Predicts the Future: Criminal History and Recidivism of Federal

Offenders* at 6–9 (2017). Like many other offenders with little to no meaningful

---

[7]     Brennan Center for Justice, What Caused the Crime Decline? (26 Feb. 2015),
available at: https://www.brennancenter.org/publication/what-caused-crime-decline

[8]     As Mr. Allen's conviction is a class B misdemeanor, the federal sentencing guidelines
do not apply. USSG §1B1.9. However, *were* Mr. Allen's criminal history calculated, he
would have zero history points, as his sole prior conviction - a Las Vegas municipal court
misdemeanor trespassing conviction, received a sentence of a year of probation and a
suspended sentence of 59 days. *See PSR* at ¶ 25. This prior conviction would garner no
criminal history points under USSG §4A1.2 (c), given that Mr. Allen's sentence for the
trespassing conviction did not include a "sentence of imprisonment" as defined in USSG
§4A1.2 (b), and did not include a term of probation exceeding one year. See USSG §4A1.2
(c).

criminal history, he should be given some benefit of the doubt that this criminal prosecution will be sufficient to deter him from future criminal behavior.[9] Finally, it cannot be ignored that for Mr. Allen, who has never before been subjected to the stringent and demanding expectations and requirements of a lengthy term of federal probation – a sentence of 36 months of probation is in itself a meaningful deterrent.

The experience of being a defendant in this case has already had a profound deterrent effect on Mr. Allen. Since being charged, he has lived with the constant looming possibility of separation from his family and his community, and has experienced the anxiety and fear at the thought of incarceration and the risk of losing his job and the gains he has made over the past years. Further, he has had to face the collateral consequences that a federal criminal conviction carries. Given these costs, only the very densest of defendants would fail to draw the obvious conclusions from this experience, and Mr. Allen appreciates exactly how seriously his crime has impacted –and will continue to effect – his life (and that of his mother's). Thus, the proposed sentence is sufficient to achieve deterrence as provided in §3553.

---

[9]     Other Courts have recognized an offender's low risk of recidivism as grounds for a below-guideline sentence.  *See, e.g., United States v. Darway*, 255 Fed. Appx. 68, 73 (6th Cir. 2007) (upholding downward variance on basis of defendant's first-offender status); *United States v. Urbina*, 2009 WL 565485, *3 (E.D.Wis. Mar. 5, 2009) (considering low risk of recidivism indicated by defendant's lack of criminal record, positive work history, and strong family ties); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (Gertner, J. (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders").

Considering his acceptance of responsibility, his background and circumstances, and the potential for his continued rehabilitation as he continues to abide by the rules and monitoring of federal probation, the proposed non-incarcerated sentence is "sufficient but no greater than necessary" to meet the § 3553(a) goals of protection of the public, incapacitation, deterrence, just punishment, and treatment. Further, it must also be said that there is also no rehabilitative value[10] for a sentence greater than that proposed. Indeed, Congress itself has "recognize[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." *See* 18 U.S.C. § 3582(a). Mr. Allen, thankfully, has no mental illness or substance use disorder history that requires intervention or treatment. Further, with the COVID-19 pandemic's ongoing

---

[10]     Further, because of the ongoing COVID-19 pandemic concerns and the continued unpredictability of outbreaks, it remains unclear what programming would be available to Mr. Allen in prison. It is quite likely that visits and phone calls with family and friends could be restricted, if not suspended entirely, for unpredictable periods of time. What little freedom of movement an incarcerated person might have within the institution, is often restricted even further during outbreaks and lockdowns during the pandemic. Incarcerated people are often locked in a small cell for 23 hours a day. The restrictions that prisons have put in place to try to slow the spread of the virus make sense. But they also significantly tip the quality of incarceration away from rehabilitation and further towards punishment, blunting the effectiveness of incarceration as a sentencing tool.

These harsher conditions of confinement during the pandemic are a valid consideration in deciding what sentence to impose. As one court noted, "When we do punish, we do not act cruelly." *United States v. Scarpa*, 815 F.Supp.88 (E.D.N.Y. 1993) (pretrial defendant with AIDS facing murder charges released on bail because of the "unacceptably high risk of infection and death on a daily basis inside the MCC"); *see also United States v. McFarlane,* 438 F.Supp.3d 125, 127 (D.Mass. 2020) (Gorton, D.J.) (holding that two-week confinement in solitary quarantine in a higher security facility is equivalent to two months in a camp). During the COVID-19 pandemic, "sufficient but not greater than necessary" can take on new meaning. In the context of post-conviction compassionate release motions, for example, courts justified sentence reductions during the pandemic "[t]o avoid a sentence that *was* sufficient but no greater than necessary from becoming one immeasurably greater than necessary." *United States v. Park*, 2020 WL 1970603 at *5 (S.D.N.Y. Apr. 24, 2020) (emphasis added) (internal citation omitted). *Accord United States v. Mel*, 2020 WL 2041674 at *3 (D. Md. Apr. 28, 2020) (finding release appropriate where "the actual severity of the sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing.").

13

existence, unpredictability, and continued impact on BOP programming - it is very likely that Mr. Allen would have little opportunity to avail himself of any programs he might otherwise qualify for. Thus, this crucial sentence goal cannot be adequately fulfilled by any sentence of imprisonment in this case.

Although a period of incarceration would certainly exist to incapacitate him, the costs cannot be justified. Instead, carceral time would destabilize him by separating him from his community and family, seriously jeopardize his current job, diminish his potential future earning capacity, isolate him from continuing to develop pro-social connections in the community, delay his productive contribution to society and his ability to begin immediately repaying restitution, and risk creating (and exacerbating) his physical and mental health. It would offer no additional deterrent or rehabilitative value, stymie meaningful retribution, and subvert the additional sentencing goals of 18 U.S.C. § 3553(a)(2). For these reasons, the defendant asks this Court to impose the requested sentence.

> ### III.   *A Lengthier Sentence of Imprisonment in this Case would Impede Mr. Allen's Ability to Make Restitution, Would Impose Disproportionate Costs on Society, and Would Not Serve the Sentencing Goal of Rehabilitation*

Lastly, the restitution obligation that Mr. Allen faces is an important sentencing consideration, and one the Court must consider under 18 U.S.C. § 3553(a)(7). *See United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006) (acknowledging district court's discretion to depart from guidelines to impose probationary sentence, since the "goal of obtaining restitution for the victims of

Defendant's offense … is better served by a non-incarcerated and employed defendant."). In Mr. Allen's situation, a sentence of incarceration would only serve to delay his ability to begin successfully paying his restitution, while also jeopardizing his current stability and employment, disenfranchising and destabilizing him from his community, and would unquestionably create a greater risk of obstacles (upon his release). It is undeniable that a criminal sentence inflicts many different types of costs on the defendant and the defendant's family, as well as financial costs that must be borne by the taxpayers. The financial cost of incarceration is an appropriate consideration in determining whether a carceral sentence is warranted and is calculated in the PSR at ¶ 67. Specifically, the August 2021 advisory from the Administrative Office of the United States Courts estimates a monthly cost of $3,688 to the government of imprisoning Mr. Allen, as compared with a $371 monthly cost of supervising him on federal probation. *Id.* Thus, not only would imprisoning Mr. Allen result in an increased risk of his destabilization, possible loss of employment, and an increased inability to seek and find new employment (for the goal of paying restitution), it would also result in a nearly 10-fold cost to the government and taxpayers than the requested sentence - which instead would immediately subject him to a lengthy and demanding term of federal probation. As such, the requested sentence far better balances the sharply elevated risks attendant to a period of incarceration than does any period of incarceration in this case.

## Conclusion

This Court should "consider every convicted person as an individual and every case as a unique study in human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Chase Allen is a young man who made an extremely misguided decision to commit the crime before this Court. He fully realizes the seriousness of his actions, he has accepted responsibility for his behaviors, and he will experience the collateral consequences of his conviction for the rest of his life. As such, the requested sentence of 36 months of probation, with exacting special conditions of supervision and the requirement of mandated restitution, is a just sentence in this case. Mr. Allen is a young man who is dedicated and determined to be a helpful and constructive member of society, and endeavors to meaningfully alter the direction of his life. The requested sentence will provide him with the structure and opportunity to do just that while also imposing upon him a demanding level of supervision and structure in the community that will ensure he remains on the right side of the law.

Respectfully submitted,

Mr. Chase Allen,
By his attorney,

*/s/ Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg
Massachusetts BBO # 674760
Federal Public Defender Office
51 Sleeper Street, 5th Floor
Boston, MA 02210
Tel: 617-223-8061

16

## **CERTIFICATE OF SERVICE**

       I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 14, 2023.

*/s/Forest O'Neill-Greenberg*
Forest O'Neill-Greenberg
